IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 28, 2007 Session

## JOHN MARK ATKINS, surviving spouse and next of kin of VICTORIA H. ATKINS, Deceased, and as parent of LAUREN ATKINS, ET AL. v. ROBERT CLIVE MARKS

Direct Appeal from the Circuit Court for Montgomery County
No. 50100330      Ross H. Hicks, Judge

No. M2006-02514-COA-R3-CV - Filed June 11, 2008

This is an appeal from a post-judgment collection proceeding in which the judgment creditor sought to subject the assets of three trusts, of which the judgment debtor was a beneficiary and trustee, to satisfy a default judgment. The trial court found that the trusts were passive or dry and that the legal and equitable estates had merged, resulting in the judgment debtor's holding fee simple title to the trust property. Debtor asserted that he had dissipated the assets of two trusts, but one trust still held income-generating farm land. The trial court ordered the farm land sold and also ordered further discovery to locate the assets of the other two trusts. We affirm in part, reverse in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in part; Reversed in part; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Robert C. Marks, *Pro Se*.

F. Evans Harvill and Michael W. Dale, Clarksville, Tennessee, and Mart G. Fendley, Clarksville, Tennessee, for the appellee, John Mark Atkins.

## OPINION

This appeal arises from a post-judgment collection proceeding. John Mark Atkins ("Creditor"), having sued as surviving spouse of Victoria H. Atkins and individually as parent of Lauren Atkins, previously secured a $500,000 default judgment[1] against Robert Clive Marks ("Debtor"), his former attorney. The court entered judgment on June 6, 2002, and the judgment

---

[1] Another plaintiff, James Michael Field, had participated in the action and secured a default judgment but did not join in this post-judgment collection proceeding.

was later registered in the Montgomery County Register of Deeds on June 20, 2002. Two writs were issued on the judgment and were returned unsatisfied (nulla bona) on October 16, 2002, and April 18, 2003, respectively. Creditor filed a petition on May 19, 2003, to subject the assets of three trusts to satisfy the judgment. The petition specifically alleged that Creditor had attempted to conduct discovery regarding Debtor's assets, but to no avail. It also stated that the trial court had consequently entered an order of contempt against Debtor, had sanctioned him, and had again ordered that Debtor respond to Creditor's discovery requests. Creditor requested that the trial court declare a lien upon the trust property; that it declare a lien upon any other property uncovered in the court-ordered discovery, and that the court subject the property to the lien.

Debtor moved to dismiss the petition, arguing that the trial court lacked subject matter jurisdiction because Creditor had filed the petition more than thirty (30) days after the *first* writ of execution was returned. In an August 12, 2004, order denying the motion, the court found the petition timely because Creditor had filed it within thirty (30) days after return of the *second* writ.

The trial consisted of three hearings conducted between August 31, 2005, and July 13, 2006. At trial, Creditor sought to reach Debtor's interest in the assets of three different trusts: the Mary H. Gholson Trust ("Gholson Trust"), the Robert Clive Marks Trust/Crummey Trust ("Insurance Trust"), and the Robert C. Marks Item IV Trust ("Building Trust"). Debtor's father had established the Insurance trust, an inter vivos trust, and the Building Trust, a testamentary trust. Debtor, however, asserted that he had dissipated all assets in those trusts.

The only trust asset still intact was the farm land held in the Gholson Trust, an inter vivos trust established by Debtor's great-grandmother in 1928, and the subject of a previous case decided by the Tennessee Supreme Court in 1958, *Marks v. Southern Trust Company*, 310 S.W.2d 435 (Tenn. 1958). In *Marks v. Southern Trust Company*, the Tennessee Supreme Court addressed whether an after-born grandchild of the settlor (Debtor's great-grandmother) was a beneficiary of the trust and whether, as drafted, the trust violated the Rule Against Perpetuities. *Marks*, 310 S.W.2d at 437. The court concluded that the settlor's fourth grandchild was a beneficiary under the trust and that there was no violation of the Rule Against Perpetuities.[2] *Id.* Following the death of the settlor's son and pursuant to the terms of the trust, the farm land was partitioned-in-kind among the settlor's four grandchildren. As one of the four grandchildren, Dempsey Marks ("Debtor's father") took an equitable interest in a discrete portion of the land. And later, Debtor's father's will further divided his portion among Debtor and his two siblings; Debtor took an interest in approximately fifty-seven (57) to sixty (60) acres of that land. One issue on appeal is the nature of Debtor's interest in this acreage.

The trial court issued a memorandum opinion on September 14, 2006, and entered its order on October 16, 2006. The order decreed all assets of the three trusts to be subject to

---

[2]This opinion affirmed the 1957 chancery court order declaring that the trust would terminate twenty-one years after the death of the last survivor of Mary Gholson's three oldest grandchildren. That death occurred on December 27, 2002, and established the trust's termination date of December 27, 2023.

execution, ordered the sale of the Gholson Trust real property, and also ordered further discovery to locate the assets of the other two trusts. Debtor filed his notice of appeal on November 14, 2006, and, on Debtor's motion, the trial court stayed the sale of the real property pending appeal. In his motion to stay the sale of property, Debtor proposed the direct payment of his farm income into the court in lieu of the bond requirement set forth in Rule 62.05 of the Tennessee Rules of Civil Procedure. The trial court then ordered the payment into court of Debtor's share of income from the real property, which would be held *in custodia legis* during the pendency of the appeal.

### *Issues Presented*

Debtor raises the following thirteen issues for review on appeal:

1. Whether the trial court lacked subject matter jurisdiction under Tenn. Code Ann. § 25-5-104 because the *Petition* filed May 19, 2003 was filed more than thirty days after the return of the first writ of execution unsatisfied on October 16, 2002;

2. Whether the trial court erred in holding that the Mary H. Gholson Trust was not an active trust because the trustee had active duties and the duty to preserve title in contingent remaindermen;

3. Whether the trial court erred in refusing to recognize the doctrine of equitable sub-trusts;

4. Whether the trial court erred in applying the doctrine of merger of the legal and equitable estates of any of the trusts litigated because the trustee and life beneficiary were the same person, ignoring the beneficial interests of remaindermen;

5. Whether the trial court erred in holding that the following were not indispensible parties: the children of Robert C. Marks as beneficiaries of the trusts, and Bank of America, holding title to the real estate in the Gholson Trust to this day;

6. Whether the trial court erred in holding that defendant had a legal interest in the Gholson Trust property when it held that legal title was vested in Bank of America as trustee;

7. Whether the trial court erred in holding that the exercise of the testamentary power of appointment by Dempsey H. Marks to Robert C. Marks Trust, Julia W. Marks, Trustee, was an invalid attempt to exercise the appointment;

-3-

8.      Whether the trial court erred in construing the said power of appointment to devise a fee simple interest in the Gholson Trust property to the debtor;

9.      Whether the trial court erred in holding that the Mary H. Gholson Trust and the Robert C. Marks Trust were not spendthrift trusts;

10.     Whether the income held *in custodia legis* by the trial court clerk is protected by spendthrift protection in transmission to the beneficiary;

11.     Whether the trial court erred by refusing to hold that Bank of America as trustee had a fiduciary duty to produce information from its fiduciary subsidiary ledgers about the Gholson Trust;

12.     Whether the trial court erred in short setting the last hearing for July 13, 2006 combined with its quashing of the custodial subpoena for Bank of America to provide the same fiduciary subsidiary ledger information about the Gholson Trust; and

13.     Whether the trial court erred in holding that the Americans with Disabilities Act and the procedures under Tenn. S. Ct. R. 45 did not apply to trial courts except in cases involving physical barriers and auxiliary aids.

Creditors, however, have reduced the issues on appeal to three:

1.      The procedural issue concerning the perfection of the Plaintiffs' lien following a second execution;

2.      The issue of the Gholson Trust, the Building Trust, and the [Insurance] Trust being dry or passive and/or merging; and

3.      The loss of spendthrift protection by the beneficiary becoming the Trustee and the fact of the [decimation of] the Building Trust and the [Insurance] Trust by the [Debtor] for his own personal benefit.

### *Standard of Review*

In this appeal, we review the trial court's findings of fact *de novo* upon the record, accompanied by a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). Our review of the trial court's conclusions of law is *de novo* upon the record with no presumption of correctness accompanying the trial court's conclusions of law. *Id.*; *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

*Analysis*

The dispositive issues on appeal, as we perceive them, are Debtor's challenge to subject matter jurisdiction, the validity of the three trusts, and the operation of the spendthrift provisions in them. We accordingly address each subject below.

*Subject Matter Jurisdiction*

Advancing the argument that the trial court lacked subject matter jurisdiction, Debtor contends that Creditor's failure to comply with Tennessee Code Annotated § 25-5-104 after return of the first writ of execution eliminated his ability to collect on the judgment and deprived the court of its jurisdiction over the matter. The relevant code provision states as follows:

> [i]n both cases, of realty and personalty, the [judgment] lien shall cease, unless a bill in equity, to subject such interest, is filed within thirty (30) days from the return of the execution unsatisfied.

Tenn. Code Ann.§ 25-5-104 (2000). Debtor asserts that after thirty (30) days had elapsed after the return of the first writ, Creditor lost the lien entirely.

To the extent that Debtor asserts Creditor forfeited the ability to collect on the default judgment, we disagree. There can be no dispute that a judgment, without more, does not give rise to a lien against the debtor's equitable interest in real property. *Kelley v. McLemore*, 560 S.W.2d 74, 76 (Tenn. Ct. App. 1977)(citing, *inter alia*, *Chumbley v. Carrick*, 254 S.W.2d 732 (Tenn. 1953)). Rather, the code requires the registration of the judgment in the proper county. Tennessee Code Annotated section 25-5-101(b)(1) provides, in pertinent part, that

> judgments and decrees obtained from and after July 1, 1967, in any court of record . . . shall be liens upon the debtor's land from the time a certified copy of the judgment or decree shall be registered in the lien book in the register's office of the county where the land is located.

Tenn. Code Ann. § 25-5-101(b)(1) (2000 & Supp. 2007). Moreover, when a creditor complies with the requirements of section 25-5-101(b) and creates the judgment lien, the lien subsists for ten (10) years following the entry of final judgment. *Id.*§ 25-5-105 (a). This right of enforcement is lost through failure to exercise the right within the period of time provided under the statute. *ATS, Inc. v. Kent*, 27 S.W.3d 923, 926 (Tenn. Ct. App. 1998)(addressing prior version of statute allowing three years for enforcement of judgments).

> In order to bind the debtor's equitable interest in realty, the creditor must register a memorandum or abstract of the judgment . . . , stating the amount and date thereof, with the names of the parties . . . in the register's office of the county where the real estate is situated.

Tenn. Code Ann § 25-5-102 (2000).  Creditor filed a copy of the judgment in the Montgomery County Register of Deeds on June 20, 2002.  Debtor contends that Creditor lost the right to enforce the judgment when he failed to file the petition within thirty (30) days after the first return of the execution *nulla bona*.  After careful review of the authorities, we conclude that notwithstanding this failure to file within that time period, Creditor's petition of May 19, 2003, established a lien sufficient to support the proceedings that followed.

Indeed, the case of *Weaver v. Smith* illustrates that even if a judgment creditor loses the lien (and priority position) that would be created by registering the judgment and then complying with this thirty-day requirement, the creditor nonetheless establishes an independent lien as of the day he or she files the petition to discover and reach the debtor's equitable assets.  *Weaver v. Smith*, 50 S.W. 771, 774 (Tenn. 1899).  In that case, the complainant judgment creditor lost its priority position to the Union Bank & Trust Company, another judgment creditor, upon failing to comply with the precursor to the thirty-day provision at issue here.  *Id.* at 774–75.  There, if Weaver (operating as clerk and master) had filed the bill to subject the defendant's property to the lien within thirty days from the first return of the execution unsatisfied, he would have perfected the judgment creditor's lien as of the day he had registered the judgment.  *Id.*  And by doing so, he would have obtained a superior priority position in relation to Union Bank & Trust. *Id.*  Instead, like Creditor, Weaver filed nothing after the first return, but then filed a bill in equity within thirty days of the second return.  *See id.*  The Tennessee Supreme Court held that Weaver had lost the prior (and superior) judgment lien by failing to comply with the statute, but had nonetheless acquired a lien by filing the bill.  *Id.*  The court stated as follows:

> [w]e are therefore of the opinion that in this case, the complainant having waited for more than thirty days after the return of the execution issued on the 26[th] and returned on the 29[th] of February, his lien was lost.  *And, while he acquired a lien by the filing of his bill, it only dated from that time, viz. the 9[th] of May*, when, as is conceded, the complainant the Union Bank & Trust Company had obtained a lien by the filing of its bill on May 7[th].

*Id.* (emphasis added).  In *Weaver*, the complainant creditor's lien was junior to that of the Union Bank & Trust Company, whereas here, Creditor need not concern himself with a priority dispute.

Indeed, the current codification of our statutes confers upon a judgment creditor the right to discover the judgment debtor's equitable assets and to subject them to his demands under the following circumstances:

> The creditor whose execution has been returned unsatisfied, in whole or in part, may proceed in the court granting the judgment, or may file a complaint in a court of general jurisdiction against the defendant in the execution and any other person, to compel the discovery of any property, including stocks, choses in action or money due such defendant, or the defendant's interest in property held in a trust for the defendant, except when the trust is exempt from the claims of the

defendant's creditors under T.C.A. §§ 35-15-501 through 35-15-507 of the Tennessee Uniform Trust Code.

Tenn. Code Ann. § 26-4-101 (Supp. 2007).   Moreover, in its provisions addressing execution and the bill to subject property, the Tennessee Code provides that

> *[t]he creditor has a lien lis pendens upon the property of the defendant* situated in the county of suit, if properly described in the bill of complaint, *on the filing of the bill, so far as concerns the pursued defendant*[3]; and the creditor may have a lien lis pendens upon all property, so described, as against bona fide purchasers and encumbrancers, for value, upon registration of an abstract of the claimed lien as provided by this Code.

Tenn. Code Ann. § 26-4-104 (2000) (emphasis added); *see Cannon Mills*, 346 S.W.2d at 269-70. According to the plain language of this statute, the case law, and the contents of Creditor's petition, we cannot avoid the conclusion that the petition established a lien sufficient to sustain the ensuing proceedings. There is no priority dispute with competing creditors, nor do any interests of bona fide purchasers or encumbrancers exist to mandate greater scrutiny for determining the lien's effectiveness as against them.  Further, and quite apart from the lien, the bill to subject statute, Tennessee Code Annotated section 26-4-101, confers upon the trial court subject matter jurisdiction over the action.  *See, e.g., Cresswell v. Smith*, 76 Tenn. 688, 1881 WL 4477, at *2–*3 (Tenn. 1881)(considering the precursor of this statute and holding that the chancery court had subject matter jurisdiction to hear the matter).   There is no need to delve further into the matter.  We conclude that the trial court correctly denied Debtor's motion to dismiss the suit on this basis.

---

[3]*But see* Tenn. Code Ann. § 20-3-101 (1994).  This section of the chapter entitled "Lis Pendens" in the title dedicated to Civil Procedure suggests that an abstract must be filed in the register's office to fix a lien lis pendens on the real property.  *Id.*  The paragraph that follows states that the rights of bona fide purchasers and encumbrancers shall not be affected until the filing occurs.  *Id.*  But the provision under the chapter entitled "Bill to Subject Property" indicates that, as to the defendant, the filing of the bill alone will fix the lien lis pendens upon the real property.  *Id.* § 26-4-104. We acknowledge the apparent conflict between these two provisions but adhere to the Tennessee Supreme Court's reasoning in *Cannon Mills, Inc. v. Spivey*:

> Insofar as these two sections may contravene each other, the provisions of 26-604 control in such a case as this.  Section 20-301 is a part of chapter 3 whose subject matter is "Lis Pendens," and 26-604 is a part of chapter 6, whose subject matter is "Bill to Subject Property."  Therefore, under T.C.A. § 1-303, the provisions of 26-604 prevail in a case of a bill like this to subject property.

*Cannon Mills, Inc. v. Spivey*, 346 S.W.2d 266, 270 (Tenn. 1961)(addressing, respectively, the precursors of current sections 26-4-104 and 20-3-101); *see also* Tenn. Code Ann. § 1-3-103 (2003) (formerly section 1-303, providing that "if provisions of different titles or chapters of the code appear to contravene each other, the provisions of each title or chapter shall prevail as to all matters and questions growing out of the subject matter of that title or chapter").  Accordingly, we conclude that in cases such as this, a lien lis pendens can attach to real property—only so far as the defendant is concerned— by the filing of the bill alone.

### *The Trusts*

Creditor seeks to reach the assets of three trusts in satisfaction of the default judgment. Debtor contends that the Insurance and Building Trusts no longer have trust property. Debtor asserts he has dissipated the Insurance Trust funds, which totaled approximately $170,000. The Building Trust has seemingly suffered a similar fate. According to Debtor, he sold his undivided half interest in two buildings (held by him as trustee and income beneficiary) between 1999 and 2001 and then dissipated the proceeds. The only asset still apparently intact is Debtor's portion of income-generating farm land held in the Gholson Trust. Pursuant to the version of Tennessee Code Annotated section 26-4-101 in force when Creditor filed the action,

> the creditor whose execution has been returned unsatisfied, in whole or in part, may proceed in the court granting the judgment, or may file a complaint in a court of general jurisdiction against the defendant in the execution and any other person, to compel the discovery of any property, including stocks, choses in action or money due such defendant, or the defendant's interest in property held in trust for the defendant, except when the trust has been created by, or the property so held in trust has proceeded from, some person other than the defendant, and the trust is declared by a deed, trust agreement or duly probated will containing spendthrift provisions which apply to such defendant.

Tenn. Code Ann. § 26-4-101(a) (2000).[4] This spendthrift trust exception to the creditor's right to discover equitable assets (and subject them to his demands) can apply only where there is an active trust. *Sternberger v. Glenn*, 137 S.W.2d 269, 271 (Tenn. 1940). The trial court found that this trust was passive, or dry, and that a merger had occurred, resulting in Debtor holding fee simple title to his allocation of the farm land. The trial court ordered the sale of this property. It found that the Building and Insurance trusts were likewise invalid and directed Creditors to proceed with discovery in an effort to locate the trust assets, if any. Accordingly, in light of the trial court's conclusions, we turn to each trust and consider whether it has failed due to merger of the legal and equitable interests, or due to the absence of trustee duties. If it is an active trust, then we address the effect of its spendthrift provision.

### *Gholson Trust*

We begin with the Gholson Trust, the entity with the most complex structure and with the only (apparently) intact corpus. Before doing so, we must first address the structural twist, or the "equitable sub-trust," imposed in Debtor's father's will. Pursuant to the Gholson Trust instrument, the settlor's grandchildren could

---

[4] The current codification of this statute refers to the spendthrift provisions of the Tennessee Uniform Trust Code, located at Tennessee Code Annotated sections 35-15-501 through 35-15-507. Tenn. Code Ann. § 26-4-101 (Supp. 2007). Any differences between the two versions do not impact on this analysis.

dispose of their respective interests in said property by will, should they elect so to do, provided that in such disposition by will none of my said grandchildren shall have the right to will or devise his or her share, or any interest therein, to any other than a direct descendant of myself.

In his will, Debtor's father executed this power of appointment by devising his equitable interest in the farm land in trust. Debtor's father attempted to trifurcate and place his equitable interest into "sub-trusts," designating one for each child. Each sub-trust bore the name of the beneficiary (i.e., "the Robert C. Marks Trust"). The will provided for Debtor's mother to be the trustee of these three sub-trusts and directed that the trustee pay the farm income to Debtor and his two siblings until the Gholson Trust terminated. The operative language was as follows:

The income from the respective trusts shall be paid, at least quarter-annually, by Trustee to the respective beneficiaries, CONSTANCE M. MATLOCK, JULIA M. MEADOWS and ROBERT C. MARKS until the time fixed for the termination of the Mary H. Gholson Trust.

Upon the termination of the herein trusts . . . the title to said real estate allotted to the CONSTANCE M. MATLOCK TRUST, the JULIA M. MEADOWS TRUST, and the ROBERT C. MARKS TRUST shall vest in CONSTANCE M. MATLOCK, JULIA M. MEADOWS, and ROBERT C. MARKS, the beneficiaries of the respective trusts, or their respective descendants per stirpes . . . .

When closing Debtor's father's estate, the probate court concluded that naming Debtor's mother as trustee would violate the terms of the Gholson trust because it would transfer an interest in the property to someone not descended from Mary Gholson. To remedy this problem, the probate court named each beneficiary as the trustee of his or her own individual sub-trust.

In this action, the trial court found that Debtor's father's devise exceeded the power of appointment set forth in the Gholson Trust document. Although the provision empowered Debtor's father to devise his equitable interest to Debtor and Debtor's two siblings, the trial court concluded that he could not impress a testamentary trust upon that interest. As we read the provision, however, the only explicit limitation imposed upon Debtor's father was that he devise his interest to a lineal descendant of his grandmother. The probate order closing the estate declared Debtor, obviously a lineal descendant of Mary H. Gholson, as beneficiary and as trustee of his own sub-trust. Further, Debtor's father devised nothing more than he owned – his equitable interest in the property.

Contending that an equitable interest in property can itself form the corpus of a trust, Debtor makes much of the need to recognize the doctrine of "equitable sub-trusts" in this jurisdiction. In imposing a trust upon the equitable interest in land, Debtor's father presumably intended to devise to the trustee the legal title to his equitable interest, and to each beneficiary

-9-

equitable title to his equitable interest in a particular portion of the land.  We need not address the issue Debtor raises because, even if we were to recognize the doctrine and rule that our law would permit such a devise, a merger of the legal and equitable estates would have occurred in any event.

> If the legal title and the beneficial interest combine in the same individual, the estate . . . may be reached by execution, as in the case of resulting trusts. But this doctrine only applies in cases of merger or where the [beneficiary] has the whole beneficial interest, with the right to call for an immediate conveyance to him of the legal estate.

*Henderson v. Hill*, 77 Tenn. 25, 1882 WL 3973, at *4 (Tenn. 1882).  Indeed, the Tennessee Uniform Trust Code[5] codifies the law of merger as follows:

> A trust is created only if . . . [t]he same person is not the sole trustee and sole beneficiary.

Tenn. Code Ann. § 35-15-402(a)(5) (2007).  The comment to this section further explains the doctrine:

> Subdivision (a)(5) addresses the doctrine of merger, which, as traditionally stated, provides that a trust is not created if the settlor is the sole trustee and sole beneficiary of all beneficial interests. The doctrine of merger has been

---

[5]The Tennessee Uniform Trust Code became effective on July 1, 2004.  The provisions are intended to have

> the widest possible effect within constitutional limitations. [It] applies to all trusts whenever created, to judicial proceedings concerning trusts commenced on or after its effective date, and unless the court otherwise orders, to judicial proceedings in progress on the effective date.

Tenn. Code Ann. §35-15-1103 cmt. (2007).  Because it commenced in May of 2003 and concluded with the entry of final judgment in October of 2006, the subject action was in progress when the Tennessee Uniform Trust Code became effective.  The statutory provision pertaining to such instances provides that it

> applies to judicial proceedings concerning trusts commenced before July 1, 2004, unless the court finds that application of a particular provision of this chapter would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties, in which case the particular provision of this chapter does not apply and the superseded law applies.

*Id.*§ 35-15-1103(a)(3).  The comment to this section emphasizes that constitutional limitations preclude a retroactive application of these provisions if they would alter trust property rights that became irrevocable before the effective date of the legislation.  *Id.* cmt.

We conclude that the application of these statutes to this action neither prejudices Debtor nor deprives him of a property right that vested prior to 2004.

inappropriately applied by the courts in some jurisdictions to invalidate self-declarations of trust in which the settlor is the sole life beneficiary but other persons are designated as beneficiaries of the remainder. The doctrine of merger is properly applicable only if all beneficial interests, both life interests and remainders, are vested in the same person, whether in the settlor or someone else. An example of a trust to which the doctrine of merger would apply is a trust of which the settlor is sole trustee, sole beneficiary for life, and with the remainder payable to the settlor's probate estate.

*Id.* At the creation of this sub-trust, Debtor became the sole trustee and sole beneficiary of his father's equitable interest in one-third of the land. According to the probate court, Debtor (or his descendants) took an income interest in the equitable estate, for a term until termination of the Gholson Trust, and a vested remainder in fee simple title to his portion of the farm land. The net result, then, was that Debtor took an equitable interest – outright – in the land allocated to him in his father's will. Whereas the further partition of his interest among his children was effective, Debtor's father did not succeed in placing his equitable interest itself in trust. Having come full circle and concluded that this sub-trust never came into existence, we now turn to the issues raised by the Gholson trust itself.

Although Debtor alleges many errors regarding the trial court's treatment of the Gholson trust, the central questions involve (1) whether the Gholson Trust was or has become a passive or dry trust; (2) whether Debtor has become the sole trustee and sole beneficiary of his portion under the Gholson trust, thus resulting in a merger of the equitable and legal estates; and, if not, (3) whether the Gholson trust contains a valid spendthrift provision such that Creditor cannot reach the corpus or income in satisfaction of the subject judgment.

1. Passive/Dry Trust

The trial court found that the Gholson Trust was a dry or passive trust. The court's memorandum opinion, later incorporated into its final order, stated as follows:

The instrument creating the Gholson trust contains no provision for the manner of management of the corpus of the trust in any regard. The trustee's sole duties as set forth in the Gholson trust are to approve any sale of the property by Mrs. Gholson's son and the majority of her grandchildren then living and after the death of her son, and to facilitate any sale with the approval of the majority of the children and the Chancery Court. There are no duties placed on the trustee regarding any assets of the trust. In fact the only "duty" of the trustee under the Gholson trust is to hold legal title to the property. There are no mandated activities of the trustee, nor are there any supervisory powers granted. There is no statement as to how the trustee is to manage or supervise the premises. There is no provision for the trustee to lease the premises, operate or supervise the farm. While the trust provides for a division of the farm into four parts following the

death of Mrs. Gholson and her son and his wife, there is no directive to the trustee regarding such division or management of the farm following the division. Although a duty is placed on the trustee to see that annual taxes are promptly paid out of the annual income of the property, the trust further provides that all income was to go not through the trustee but directly to the beneficiaries, leaving the trustee with no practical way of seeing that taxes were paid. It is apparent that the trustee was to hold only bare legal title in an effort to perpetuate the real estate in the family. In actuality, Mrs. Gholson retained a life estate for herself and her husband, then life estates were given to her son and his wife and following their lives, the property was to go to her son's children and their issue, each of whom had a power of appointment over his or her interest in the land.

The trial court likewise found that, in reality, the bank had never performed trust duties. Indeed, the testimony of Julia Marks, George Marks (manager of the farm and cousin to Debtor), and bank employees supported this conclusion. Specifically, the trial court noted that the bank had never managed, supervised, or controlled the corpus of the trust; Debtor's father had managed the farm operations during his lifetime, and George Marks currently operated the farm without any supervision from the bank or from Julia Marks, mother of Debtor and holder of power of attorney to operate the farm on behalf of Debtor and his siblings. The trial court further found that, after the death of Dempsey Marks in 1993, the bank disbursed a small amount of cash and thereafter did nothing, assuming it was no longer the trustee; that, nonetheless, the bank did not formally resign until 2005 and, at the time of trial, still held legal title to the farm; and that the bank had never received or disbursed farm income, nor paid the property taxes. There appears to be no dispute regarding these facts.

The trial court did not clarify whether it found the Gholson Trust to have been dry at its inception or to have become so over the course of the trustee's inactivity. For the following reasons, we find that the 1928 trust instrument created an active trust and that, notwithstanding Bank of America's inactivity since 1993, the trust has remained active.

First, we look to the trust instrument itself to determine if it failed to create an active trust. Although the 1928 trust instrument omitted certain details and contemplated a limited role for the trustee, it created an active trust. A trustee takes the "quantity of interest which the purposes of the trust require." *Jourolman v. Massengill*, 5 S.W. 719, 722 (Tenn. 1887). Where the trust imposes no duty upon the trustee, it is dry, and legal title passes not to the named trustee, but rather to the beneficial owner. *Id.* On the other hand, if the trust instrument imposes any express or implied duty upon the trustee, then the trust is not dry. *Id.* The intent, object, and purpose of the settlor determine the extent of title vested in the trustee. *Id.*

The settlor's declaration of a trust purpose or of the trustee's powers and/or responsibilities often render the trust active. For example, in *Jourolman v. Massengill*, the Tennessee Supreme Court held that a testamentary trust was active where the testator intended to limit the realty's rents and profits to the support of his son and widow; to prevent the alienation

-12-

of the corpus; to prevent the subjection of the corpus or rents to creditors; and to preserve the remainder estate. *Id.* at 723–24. The court concluded that the testator's intent necessarily contemplated the interposition of a trustee, as none of these wishes could be fulfilled without one. *Id.* Similarly, in *Warrick v. Wright*, the testator created an active trust where the will directed the trustee to, among other things, collect income from the trust estate, remit installments to the life beneficiary, and exercise discretion in encroaching upon the principle for the support of the beneficiary. *Warrick v. Wright*, 884 S.W.2d 126, 127–29 (Tenn. Ct. App. 1994).

In this jurisdiction, even minimal duties will suffice to support an active trust, but where the trust document fails to set forth the purposes of the trust or to define the trustee's powers and/or responsibilities, the trust may be passive or dry. *Hall v. Gossum*, 228 S.W. 1039, 1044 (Tenn. 1921) ("The deed to [the trustee] shows that the trust created was a dry one. It gave him no power, and imposed upon him no duty except to hold said property for his wife."); *see Baskin v. Commerce Union Bank of Rutherford County*, 715 S.W.2d 350, 353 (Tenn. Ct. App. 1986) (holding that even if testator had expressly stated the desire to create a trust, it would have been dry where testator failed to define the trustee's responsibilities).

Although the Gholson Trust instrument placed more duties upon the trustee at the trust's inception, it (and a chancery court's construction of the trust document) places the following existing duties upon the trustee: to see that taxes are paid on the property; to reach an agreement with the beneficiary regarding which buildings on the land to insure; in the event oil, gas, or other minerals are located on the land, to collect and invest the receipts from those leases; and in the event of the sale of any portion of the land, to invest those proceeds. Moreover, as discussed below, the trust document contained a spendthrift provision. Although minimal, these obligations are active duties nonetheless.

Nor do we perceive the Gholson Trust as having become passive or dry in light of the absence of a functioning trustee for several years. We can find no authority for the proposition that a trustee's failure to act, without more, renders the trust dry or passive. An otherwise valid, active trust can become dry or passive – thus hastening its termination – if its purposes have been fulfilled. *Lewis v. Bowers*, 392 S.W.2d 819, 822-23 (Tenn. 1965)(relying, in part, upon *Park v. Cheek*, 44 Tenn. 20 (1867)). For example, where the primary purpose of the trust is to protect named beneficiaries who have not yet reached a specified age and where, at the time the will takes effect, they have reached that age, the trust ceases because its purposes have been accomplished. *Id.* at 823; *First Amer. Nat'l Bank v. Cole*, 364 S.W.2d 875, 878 (Tenn. 1963) . Similarly, when the purpose of the trust is to protect the trust property against the marital rights of the life income beneficiary's husband, the beneficiary dies, and the estate passes to her descendants, the property passes outright to them, the trust having ceased. *Ellis v. Fisher*, 35 Tenn. 231, 1855 WL 2446, at *3 (Tenn. 1855). Given that the Gholson Trust terminates on a particular date rather than an event or accomplishment of a goal and that the Trustee has ongoing duties, we cannot say its purposes have been fulfilled even though the farm functioned without the trustee's involvement between 1993 and 2005.

2.    Merger

The trial court similarly found that a merger of the legal and equitable estates had occurred, thus resulting in Debtor's holding fee simple title in the farm land. It stated that

> [t]he legal effect is that [Debtor] holds a vested fee estate in and to the Gholson realty by virtue of the fact of being his own Trustee and the sole beneficiary and is receiving all the income from the same.

The most vexing aspect of these facts is the identity of the trustee for Debtor's portion of the Gholson Trust. Without first determining the identity of the trustee, we cannot resolve the question of merger. The trial court concluded that Debtor was the trustee while also noting that Bank of America was the record title holder. Yet, Debtor had exercised no control over the corpus of the Gholson Trust. As discussed below, we find that the Debtor was neither the formal trustee of the Gholson trust nor its de facto trustee.

First, despite its inaction, Bank of America[6] was the formal trustee until 2005 and even now retains the duties and powers of the trustee until replaced.[7] At the time of trial, Bank of America still held legal title to the property but had formally resigned as trustee on June 8, 2005, prior to commencement of the trial hearings. No successor trustee was appointed. Although the formal resignation occurred in 2005, the bank had ceased acting as trustee as early as 1993, after the death of Debtor's father and under the belief that Debtor's mother was the successor trustee as outlined in Debtor's father's will. The record reflects that the trust officer closed the trust account and disbursed its funds to her in 1993 and, when forwarding the property tax bill that year, suggested that she file a change of address with the state so that she could receive the bill directly. The bank had formally resigned as trustee, with court approval, for the other portions[8] of the Gholson Trust in 2003, and had secured the court's approval and appointment of successor trustees in its stead; however, it took no such action in regard to this portion of the trust.

Second, Debtor never exercised dominion over the corpus of the Gholson Trust. The record reveals that he has done nothing more than receive income from the farm. And, despite the bank's lack of involvement over those years, there is no suggestion or evidence of wrongdoing or mismanagement as occurred with the other two trusts, the Insurance Trust and the

---

[6]Primarily due to successive mergers of financial institutions, a number of banks have served as Trustee since 1928. The last institution to function as trustee was Bank of America.

[7]The Tennessee Code provides that

> [u]nless a cotrustee remains in office or the court otherwise orders, and until the trust property is delivered to a successor trustee or other person entitled to it, a trustee who has resigned or been removed has the duites of a trustee and the powers necessary to protect the trust property.

Tenn. Code Ann. § 35-15-707 (2007).

[8]By "other portions" we mean the land allocated to Debtor's two siblings.

-14-

Building Trust, under consideration. The record indicates that property taxes had been paid at least through 1995, and nothing suggests a failure to pay them in the years that followed.

Third, neither his father's will nor the probate court ever appointed Debtor as trustee of the Gholson trust. The will utilized language that differentiated the sub-trusts from the larger Gholson trust. For example, Debtor's father provided that he was devising the "equitable fee to the real estate" allotted to him, making clear that he was not attempting to devise a legal interest in the property itself. Further, Debtor's father expressly stated that the "sub-trusts" would subsist, and Debtor and his siblings would continue to receive farm income, until "the time fixed for termination of the Mary H. Gholson Trust."

The probate order closing Debtor's father's estate similarly acknowledged the Gholson trust as a separate and ongoing entity; for example, the order professed to construe the three "sub-trusts" including a "construction of those trusts in conjunction with the Mary H. Gholson Trust." Notwithstanding the probate court's silence regarding the distinction between the duties of the Gholson trustee from those of the "sub-trustees," we see no language in Debtor's father's will or in the probate order that suggests these "sub-trustees" should supplant the Gholson trustee. In short, we do not read the probate order as having appointed Debtor to be the trustee of his allotment under the Gholson trust. We reverse the trial court's determination that a merger occurred in this instance.

      3.     Spendthrift Provision

Although we conclude that the farm land remains in trust, we still must consider the effect of the spendthrift provision upon the land and upon the income it generates.

> To the extent a beneficiary's interest is not subject to a spendthrift provision, the court may authorize a creditor or assignee of the beneficiary to reach the beneficiary's interest by attachment of present or future distributions to or for the benefit of the beneficiary or other means. The court may limit the award to such relief as is appropriate under the circumstances.

Tenn. Code Ann. § 35-15-501 (2007). We look first to the language of the Gholson Trust itself to determine the extent to which Debtor's interest is protected under its spendthrift language:

> It is hereby expressly provided that no sale in any other manner shall be made of said property or any portion thereof during the term of this trust. It is further expressly provided that none of the beneficiaries hereunder shall ever have the right to mortgage or encumber said property, or his or her share thereof, nor shall any interest that any beneficiary may have therein or in the income, rents and profits therefrom, shall ever be liable for any debts, contracts, or obligations of any kind of character; nor shall any beneficiary have the right to sell, mortgage or

-15-

dispose of, by way of anticipation or otherwise, more than his or her share in one year's income, rents and profits therefrom.

The Tennessee Uniform Trust Code provides that a "spendthrift provision is valid only if it restrains both voluntary and involuntary transfer of a beneficiary's interest." *Id.* § 35-15-502.[9] The comment to this section elaborates further upon the spendthrift provision:

Under this section, a settlor has the power to restrain the transfer of a beneficiary's interest, regardless of whether the beneficiary has an interest in income, in principal, or in both. A creditor of the beneficiary is prohibited from attaching a protected interest and may only attempt to collect directly from the beneficiary after payment is made. . . .

*Id. cmt.* Once distributed to the beneficiary, income paid from a valid spendthrift trust becomes subject to execution by creditors of the beneficiary; however, where the spendthrift provision as to income is invalid, a creditor may reach the beneficiary's interest in the income before the beneficiary comes into possession of it.

We construe the Gholson trust as restraining the voluntary and involuntary transfer of the farm property itself, but as allowing a beneficiary to voluntarily transfer a year's worth of income from the property. Thus, that portion of the Gholson spendthrift provision pertaining to the voluntary alienation of farm income is invalid, and Debtor's interest in that income is subject to execution. We affirm this portion of the trial court's order, including the income *in custodia legis*, and otherwise reverse the judgment as it pertains to the Gholson trust.

### *Insurance Trust*

Debtor's father established an irrevocable insurance trust on January 18, 1983, and named his wife and his brother as trustees and his three children as beneficiaries. The trust contained various insurance policies and functioned as one trust during Debtor's father's lifetime. At his death, however, the trust then split into three trusts, with one-third of the proceeds funding a separate trust for each child. Upon the death of his father, Debtor was to receive "the net income therefrom for and during his natural life." After Debtor's death, the income was to go to Debtor's children. The trustees had the discretion to encroach upon the corpus up to the greater of $5,000 or 5%, for any of four support-related reasons. The trust document also provided that

---

[9] Debtor asserts that this provision does not apply here because its application would prejudice the right of the income beneficiary to the income. Debtor merely cites this recently enacted law and argues it does not apply; he cites no other (previous) authority in its stead. We are not convinced that this codification represents a change in law that would prejudice Debtor's rights. Indeed, we are unaware of any existing authority that allows for a beneficiary's power to alienate an interest by anticipation, while still conferring spendthrift protection upon it. In fact, section 152 of the Restatement (First) of Trusts states that "a trust in which by the terms of the trust a valid restraint on the voluntary and involuntary transfer of the interest of the beneficiary is imposed is a spendthrift trust." Restatement (First) of Trusts § 152 (2) (1935).

Debtor's mother had the power to replace the initial trustees, and she exercised this power as reflected in the probate court's order closing his estate. The order stated that she was removing the trustees and replacing Debtor as trustee of his own individual trust. Debtor then took possession of the corpus (approximately $170,000) and, according to him, dissipated the funds.

Because Debtor was, at most, a life income beneficiary, he did not hold the entire beneficial interest. No merger of the legal and equitable estates could occur here for that very reason. We likewise find no suggestion of a passive or dry trust as defined in our case law, as the trustee was expected, among other things, to distribute the income and exercise discretion in encroaching upon the corpus. Finally, the Insurance Trust document contained a valid spendthrift provision restraining both the voluntary and involuntary alienation of the beneficiaries' interests. Accordingly, we reverse the trial court's judgment as it relates to this trust.

### Building Trust

Debtor's father's will established the Building Trust as follows:

I give, devise and bequeath to my son, ROBERT C. MARKS, as TRUSTEE, my one-half (½) interest in the buildings known as ... to hold upon the following trust, to-wit: - -

1.      ROBERT C. MARKS shall be paid at least quarter-annually the income from the trust for and during his natural life.

2.      The said ROBERT C. MARKS shall have the Special or Limited Power of Appointment, exercisable alone, at any time and in all events, to appoint by specific reference to this power in his Last Will all or any part of the corpus and undistributed income of the trust remaining at the time of his death, free from this trust, to his next of kin only, in such proportions and subject to such terms, trusts and conditions as he may direct by his Last Will. Said power may be exercised by the said ROBERT C. MARKS irrespective of the time of his death and even though he dies before my Trustee receives the trust assets.

3.      In the event ROBERT C. MARKS does not exercise this special power of appointment conferred upon him then, upon [his death,] the income from the trust shall be paid equally to or for the use and benefit of HUNTER LEE MARKS and ROBERT CLIVE MARKS, JR. until ROBERT CLIVE MARKS, JR. attains thirty-five (35) years of age.

4.      When the said ROBERT CLIVE MARKS, JR. attains the age of thirty-five (35) years, the trust shall terminate and the corpus of the trust shall be

> delivered to HUNTER LEE MARKS and ROBERT CLIVE MARKS, JR.
> equally, share and share alike per stirpes.

We cannot conclude that the Building Trust was a passive or dry trust. As noted above, a trustee takes the "quantity of interest which the purposes of the trust require." *Jourolman v. Massengill*, 5 S.W. 719, 722 (Tenn. 1887). Although the terms of the provision establishing the building trust placed no apparent duties upon Debtor as trustee, Debtor's father made clear his desire for Debtor to exercise his discretion in devising the real property. In the event Debtor would choose not to exercise his power of appointment, Debtor's father clearly contemplated a trustee exercising discretion in paying the income to his grandsons until the younger of the two reached age thirty-five (35) and the trust terminated. In this case, the interposition of a trustee would be necessary.

Nor can we conclude that merger occurred here, as Debtor was no more than a life income beneficiary with a limited testamentary power of appointment. Furthermore, Debtor's father's will contained a generally applicable, and valid, spendthrift provision. We accordingly reverse the trial court's judgment as it pertains to the Building Trust.

### *Failure to Join Bank of America and Debtor's Children*

Debtor, upon multiple occasions at trial, asserted that Creditor was required to join Bank of America and his children as parties necessary for the just adjudication of the matter. The trial court decided to "see how [the trial] develop[ed]" but never ordered their joinder. According to Debtor, the trial court's refusal to order joinder prejudiced him by resulting in the court's ordering the farm land to be sold. In light of our determination that the farm land remains in trust and cannot be sold in satisfaction of the judgment, this issue has been pretermitted.

### *ADA Issue*

On appeal, Debtor raises the following issue:

> Whether the trial court erred in holding that the Americans with Disabilities Act and the procedures under Tenn. S. Ct. R. 45 did not apply to trial courts except in cases involving physical barriers and auxiliary aids.

His entire argument on this issue is as follows:

> The trial court so held by *Order* entered January 6, 2006. This is error because under the Judicial ADA Policy enacted pursuant to Rule 45, the "Judicial Branch shall conduct its services, programs or activities, when viewed in their entirety, in a matter that is readily accessible to and useable by qualified individuals with disabilities."

(Citations to record omitted). After reviewing the record in light of the above argument, we conclude that this issue is without merit.

### *Conclusion*

We reverse, in part, the trial court's judgment because we find that the corpus of the Gholson Trust remains in an active trust and under the protection of a spendthrift provision. Similarly, finding that there was no merger of the legal and equitable estates in the Insurance and Building Trusts, we reverse that portion of the trial court's judgment. Notwithstanding the foregoing, we affirm the judgment as it relates to certain income generated by Debtor's portion of the Gholson Trust, as it is outside spendthrift protection. Costs of this appeal are taxed equally, one-half to Appellant, Robert C. Marks, and his surety, and one-half to Appellee, John Mark Atkins, for which execution shall issue if necessary.

_____
DAVID R. FARMER, JUDGE