RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

In re:   EARL BENARD BLASINGAME; MARGARET
GOOCH BLASINGAME,

　　　　　　　　　　　　　　　　*Debtors*.

───────────────────────────────────────

CHURCH JOINT VENTURE, L.P., on behalf of Chapter 7
Trustee,

　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　　*v*.

EARL BENARD BLASINGAME and MARGARET GOOCH
BLASINGAME (18-5549/5623); BLASINGAME FAMILY
RESIDENCE GENERATION SKIPPING TRUST (18-5549);
BLASINGAME FAMILY BUSINESS INVESTMENT TRUST
(18-5623),

　　　　　　　　　　　　　*Defendants-Appellees*.

Nos. 18-5549/5623

Appeal from the Bankruptcy Appellate Panel of the Sixth Circuit;
Nos. 17-8009/8011/8029—Guy R. Humphrey, Daniel S. Opperman, and Tracey N. Wise,
Bankruptcy Appellate Panel Judges.

United States Bankruptcy Court for the Western District of Tennessee at Memphis;
Nos. 2:08-bk-28289; 2:15-ap-00339; 17-ap-00049—Jennie D. Latta, Judge.

Decided and Filed:  April 3, 2019

Before:  GRIFFIN, KETHLEDGE, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Bruce W. Akerly, MALONE AKERLY MARTIN PLLC, Dallas, Texas, for
Appellant.   Michael P. Coury, GLANKLER BROWN, PLLC, Memphis, Tennessee, for
Appellees.

---

**OPINION**

---

THAPAR, Circuit Judge.   Earl and Margaret Blasingame (the "Blasingames") filed for bankruptcy, claiming they did not have much money to their name.   One of their creditors, Church Joint Venture ("Church"), said otherwise.   In fact, Church alleged that the Blasingames engaged in a decades-long scheme of fraud to hide their assets.   So Church filed multiple actions to recover those assets.   Two of Church's actions are now before us, and we affirm the bankruptcy court's dismissal of each.

I.

Over a decade ago, the Blasingames filed for bankruptcy.   They sought to discharge $7.7 million in debt, claiming they made under $900 per month and owned less than $6,000 worth of assets.   Their creditors, including Church, were skeptical.   Church investigated and allegedly discovered fraud on a massive scale.   Specifically, Church said that the Blasingames made over $300,000 per year and had at least $18 million in assets, including "a 28-acre, gated residence compound" complete with a heated swimming pool and lighted tennis courts, 1,700 acres of "prime farmland," and hundreds of thousands of dollars in cash and financial assets. 09-00482 Adversary Proceeding Record ("A.P.R.") 1 ¶¶ 2–23.   These assets all belonged to a handful of trusts and corporations under the Blasingames' control.   Church contended that these trusts and corporations were mere shams to defraud creditors and were in reality "one and the same" with the Blasingames. *Id.* ¶ 3.   Thus, Church claimed that these assets should be available to the Blasingames' creditors to satisfy their debt.   The question was how Church could reach these assets.

To understand Church's options, we need to take a step back for some context on how bankruptcy proceedings work.   When debtors, like the Blasingames, file for bankruptcy, their property generally becomes property of the (newly-created) bankruptcy estate.   The government can then appoint a bankruptcy trustee to administer that estate.   11 U.S.C. §§ 323, 541(a), 701. The bankruptcy trustee's goal is to maximize the value of the estate and, in turn, to maximize the

amount the creditors will get paid. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985); 11 U.S.C. § 704(a)(1). Along with ordinary types of property (cash, real estate, etc.), the bankruptcy estate's property also includes causes of action that the debtors "could have . . . brought" before they filed for bankruptcy. *Tyler v. DH Capital Mgmt., Inc.*, 736 F.3d 455, 462 (6th Cir. 2013). Thus, if the debtors could have sued somebody or some entity for damages or property before they filed for bankruptcy, then the trustee may also bring that suit. Relatedly, the bankruptcy trustee may also sue to invalidate property transfers that the debtors made before they filed for bankruptcy. In this way, the trustee brings that property back where it belongs: in the bankruptcy estate. *See* 11 U.S.C. §§ 544, 548; *see, e.g.*, *In re Moore*, 608 F.3d 253, 257–62 (5th Cir. 2010) (noting that causes of action for fraudulent-transfer and alter-ego were property of the bankruptcy estate under state law).

Sometimes the bankruptcy trustee does not want to do the dirty work, and sometimes the trustee simply *cannot*—like when it has run out of money to pay for lawyers. *See, e.g.*, *In re Trailer Source Inc.*, 555 F.3d 231, 241, 244 (6th Cir. 2009). The trustee has several options in these situations, two of which are relevant here. First, the bankruptcy trustee can allow a creditor to sue on the trustee's behalf, giving the creditor "derivative standing." *Id.* at 241 (describing derivative standing as a "well-established practice"). The creditor becomes an additional named party, but the suit continues in the bankruptcy court and any recovery goes to the bankruptcy estate, not the creditor. *See id.* Second, like any other asset of the bankruptcy estate, the trustee can decide to sell the cause of action. *See In re Moore*, 608 F.3d at 257–58. The proceeds of that sale increase the bankruptcy estate, but the sale also means that the bankruptcy trustee gives up its right to sue based on that cause of action. Thus, that cause of action can no longer affect the value of the bankruptcy estate, which means the bankruptcy court no longer has jurisdiction over it. *See In re Wolverine Radio Co.*, 930 F.2d 1132, 1140–42 (6th Cir. 1991) (citing 28 U.S.C. § 1334). So the purchaser of the cause of action generally must sue in a different court.

Turning back to the Blasingames' bankruptcy, the Bankruptcy Trustee initially tried to recover the assets Church found. Specifically, the Bankruptcy Trustee authorized Church to sue derivatively on its behalf in bankruptcy court. But a few years into that proceeding, the Bankruptcy Trustee changed course and decided to sell the cause of action instead. Church

bought the cause of action for a lump sum payment and a reduction in Church's claim against the bankruptcy estate.  R. 356, ¶ 2–4 (the "Sale Order").

Since the sold cause of action could no longer affect the value of the bankruptcy estate, the bankruptcy court dismissed Church's case for lack of jurisdiction.  So Church filed a new lawsuit against the Blasingames and their trusts in district court and claimed that the Blasingames' trusts were their "alter-egos."  But the district court dismissed this lawsuit, concluding that Tennessee would not recognize Church's alter-ego theory outside of the corporate context.  *Church Joint Venture v. Blasingame*, No. 12-2999, 2016 WL 3248044, at *7–9 (W.D. Tenn. Jan. 13, 2016)*, appeal docketed*, No. 18-6142 (6th Cir. Oct. 29, 2018).

Unhappy with this setback, Church tried again in bankruptcy court, filing another adversary proceeding on behalf of the Bankruptcy Trustee.  This new case specifically targeted just one of the allegedly offending trusts—the Blasingame Family Business Investment Trust (the "Investment Trust").  But the underlying factual allegations were the same:  that the Blasingames used the Investment Trust as a front to shield their assets from creditors.  This time, Church emphasized a different legal theory—that the trust was "self-settled," meaning the settlors, trustees, and beneficiaries were all one and the same.  Church argued that the Blasingames exercised complete control over the Investment Trust, making it invalid.  But the bankruptcy court concluded that the self-settled suit was just a subset of the first, broader cause of action.  And since the Bankruptcy Trustee already sold that cause of action, the Trustee could not pursue it again, nor could Church pursue it on the Trustee's behalf.  Thus, the bankruptcy court dismissed the case for lack of standing.

Separately, Church filed another adversary proceeding on behalf of the Bankruptcy Trustee, targeting the Blasingame Family Residence Generation Skipping Trust (the "Residential Trust").  Church argued that the Residential Trust granted the Blasingames a legal life estate that the Blasingames' creditors could use to recover some of their debts.  The bankruptcy court, however, found that the Blasingames' interest was equitable, not legal, and thus beyond their creditor's reach.  So it dismissed Church's complaint.

The Bankruptcy Appellate Panel affirmed both of Church's losses, and Church appealed to this court.  *In re Blasingame*, 585 B.R. 850, 852 (B.A.P. 6th Cir. 2018); *In re Blasingame*, Nos. 17-8009/8011, 2018 WL 2084789, at *1 (B.A.P. 6th. Cir. May 3, 2018).  This court has jurisdiction because these are "core" proceedings, and the two orders terminating them were final.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 & n.3 (2015); *In re Jackson Masonry, LLC*, 906 F.3d 494, 499 (6th Cir. 2018).  We directly review the bankruptcy court's decision, assessing its fact findings for clear error and its legal conclusions de novo.  *In re Behlke*, 358 F.3d 429, 433 (6th Cir. 2004).

## II.

*Self-settled action.*    Church (on behalf of the Bankruptcy Trustee) argues that the Investment Trust is "'self-settled' because . . . the Blasingames are the settlors [i.e., the creators], beneficiaries and trustees."  17-00049 A.P.R. 1 ¶¶ 50–51; *see Barnett v. Barnett*, No. E2008-02679-COA-R3-CV, 2010 WL 680983, at *4 (Tenn. Ct. App. Feb. 26, 2010) (acknowledging a self-settled trust claim under Tennessee law).  A self-settled trust cannot be used to shield one's assets from creditors.  *In re Wilcox*, 233 F.3d 899, 904 (6th Cir. 2000).  Accordingly, Church argues that the Investment Trust's assets should be added to the bankruptcy estate.  But Church is suing derivatively, on behalf of the Bankruptcy Trustee, and the Bankruptcy Trustee already sold "the claims and cause of action of the [Bankruptcy] Trustee which have been asserted in that [first] Action."  R. 356, ¶ 2.  So if those "claims and cause of action" included the legal theory that the Investment Trust is self-settled, then the Bankruptcy Trustee no longer owns it, and the foundation for Church's derivative standing crumbles.

The term "cause of action" answers the question before us.  Though that term can be understood broadly or narrowly, Church loses under either understanding.

A "cause of action" is best understood as a set of facts giving rise to one or more grounds for legal relief.  *See United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315–16 (2012); *Creech v. Addington*, 281 S.W.3d 363, 381 (Tenn. 2009); *Black's Law Dictionary* 266 (10th ed. 2014) (defining "cause of action" as "[a] group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from

another person"). Critically, raising a different legal theory based on the same underlying facts does not create a new cause of action. *See* 18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4407 ("It will remain as clear as ever that a mere change in legal theory does not create a new cause of action."). For instance, in *Creech*, the Tennessee Supreme Court found that a fraudulent misrepresentation claim and a breach of contract claim were part of the same cause of action because they arose out of the same failed construction project. 281 S.W.3d at 369, 382. Underlying facts, not legal theories, define causes of action.

Church's self-settled legal theory is based on the same underlying facts as the first case— i.e., the first case the Bankruptcy Trustee brought to try and recover the Blasingames' trusts' assets. In that case, Church (on behalf of the Bankruptcy Trustee) alleged that the Blasingames have "unrestricted control" over their trusts—regularly co-mingling their individual assets with those of the trusts and using them for extravagant personal purchases. 09-00482 A.P.R. 1 ¶¶ 30, 51. Church repeatedly pointed to the Investment Trust as one example and listed specific Investment Trust assets that should be considered the Blasingames' personal assets. The complaint concluded by requesting that the Blasingames' trusts' assets be considered personal assets of the Blasingames, available to their creditors in bankruptcy. All of this neatly lines up with the new self-settled complaint that Church has attempted to bring. The self-settled complaint essentially rehashes the same factual allegations (though only about the Investment Trust) and requests the same relief: "The Blasingames at all times relevant have exercised complete dominion and control over the Investment Trust. . . . The Blasingames have unlimited access to these [Investment Trust] funds . . . which they use to purchase anything they wish. . . . The Investment Trust is self-settled . . . [t]hus, assets of the Investment Trust are and should be determined to be property of the Blasingames' bankruptcy estates." 17-00049 A.P.R. 1. ¶¶ 40, 44, 52.

Church's self-settled complaint does emphasize a different legal theory—describing the trust as "self-settled" rather than an "alter-ego" or "instrumentality"—but that does not constitute a separate cause of action. *See Creech*, 281 S.W.3d at 382. Nor does it matter that the self-settled complaint contains additional factual details about the Investment Trust—for instance, a list of the Investment Trust's assets and excerpts of its terms. Different legal theories almost

always "emphasize different aspects of the same facts or rely on some factual details rather than others," but if they are part of the same overall group of facts, then they are part of the same cause of action. *Arangure v. Whitaker*, 911 F.3d 333, 346 (6th Cir. 2018).

Of course, these cases concern the res judicata doctrine, not the interpretation of a contract assigning a cause of action. But the fact that the phrase "cause of action" typically arises in the context of res judicata does not mean its commonly understood definition only applies in that context. Indeed, courts have applied a fact-based approach to causes of action in other contexts, too. *See, e.g.*, *Corley Enters. of La., Inc. v. Bear Creek Saloon, Inc.*, No. 2018 CA 1147, 2019 WL 989728, at *11 (La. Ct. App. Feb. 28, 2019) (holding that "[b]ecause the [plaintiff's] petition for intervention arose from the same factual occurrence" as a different party's action, both plaintiff and that other party "share a single cause of action"); *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081, 1091 (3d Cir. 1980) (recognizing that a defendant should be "free of successive and repeated suits growing out of the same basic facts"). Additionally, the principles underlying res judicata apply to assignments of causes of action. Take this case, for example. Permitting the Bankruptcy Trustee to re-assert factual allegations that it already sold—and that are already being pursued in a separate action—would lead to the exact problems res judicata prevents: "the expense and vexation" of multiple lawsuits, wasted "judicial resources," and "the possibility of inconsistent decisions." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153–54 (1979)); *cf. Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577–81 (6th Cir. 2008) (applying res judicata to an analogous sale order in bankruptcy). Thus, a fact-based interpretation of the term "cause of action" is appropriate in this case.

But Church still loses even if we accept its argument that "cause of action" only includes specific legal theories, rather than the facts underlying them. *See Black's Law Dictionary* 267 (10th ed. 2014) (alternatively defining "cause of action" as "[a] legal theory of a lawsuit"). The first complaint specifically sought declaratory relief that the trusts were "self-settled." *See* 09-00482 A.P.R. 1 ¶ 53. Within the "First Cause of Action" section, the complaint sought a declaration that the Blasingames' trusts have "lost their independent status . . . as clearly indicated by the transfer of Debtors' property into the Trusts . . . rendering the Trusts *self settled*

in whole or part." *Id.* (emphasis added). And Church repeatedly described the trusts as "self settled" throughout the rest of the complaint. *See, e.g.*, *id.* ¶¶ 33, 47, 49. At the very least, this indicates Church recognized that the first complaint's factual allegations encompassed a self-settled trust legal theory. Ultimately, Church was "master of [its] complaint," so we take Church at its word: the first complaint included a "Cause of Action" that the Investment Trust was "self settled." *Id.* ¶ 53; *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987). And the Bankruptcy Trustee sold the "causes of action" contained in that first complaint.

Anticipating our interpretation of the Sale Order's text, Church makes two arguments. First, Church points to "extrinsic evidence" suggesting that the parties interpreted the Sale Order narrowly. But extrinsic evidence is irrelevant when the text is clear. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) ("It is the Court's duty to enforce contracts according to their plain terms. . . . The courts, of course, are precluded from creating a new contract for the parties."); *see also City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) ("An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation.") The text of the Sale Order answers the question before us. Second, Church argues that law-of-the-case doctrine applies. That doctrine provides that courts' earlier decisions "should continue to govern the same issues in subsequent stages in the same case." *Musacchio v. United States*, 136 S. Ct. 709, 716 (2016). Church contends that under the law-of-the-case doctrine, the bankruptcy court's latest interpretation of the Sale Order should not govern because it is inconsistent with its prior interpretations. For example, the bankruptcy court initially concluded that the Sale Order did *not* include the life estate action. *See infra* Part III, n.1. According to Church, that is inconsistent with its later interpretation that the Sale Order *did* include the self-settled action. Yet even with the assumption that an inconsistency exists, it does not impact our review on appeal. Law-of-the-case doctrine means the district court's prior rulings bound its discretion. But those rulings clearly cannot bind us. "An appellate court's function *is* to revisit matters decided in the trial court." *Musacchio*, 136 S. Ct. at 716.

In short, the Bankruptcy Trustee sold the "cause of action" asserted in the first case against the Blasingames' trusts. A "cause of action" is defined by underlying facts. Thus, the

Bankruptcy Trustee sold the right to sue under *any* legal theory based on the same factual allegations in the first complaint—namely, factual allegations that the Blasingames and their trusts were one and the same. Now the Bankruptcy Trustee (through Church) has attempted to bring those same factual allegations again, dressed up in a different legal theory. But that disguise does not salvage its case. The Bankruptcy Trustee already gave up the right to pursue this self-settled action, so the bankruptcy court properly dismissed it.

III.

*Life estate action.* The second lawsuit centers on a different trust—the Residential Trust. That trust states that the Blasingames may reside in the "principal personal residence [(the "Residence")] . . . for their life." 15-00339 A.P.R. 31-10 ¶ 5(b)(1). The critical question is whether that language grants the Blasingames a full legal life estate in the Residence or merely an equitable interest that lasts while they are alive ("equitable life estate" for short).[1] The parties agree that this issue is determinative: that creditors *can* reach a *legal* life estate because it entails "full enjoyment and use of the property" during life, while creditors *cannot* reach an *equitable* life estate because it entails more limited rights. 28 Am. Jur. 2d *Estates* § 58 (2018); *see In re Blasingame*, 2018 WL 2084789, at *3–4 & n.5 (citing 11 U.S.C. § 542(a)). And the parties also agree that the extent of a beneficiary's interest in a trust depends on "the four corners of the trust instrument." *In re Estate of Marks*, 187 S.W.3d 21, 28 (Tenn. Ct. App. 2005).

The most fundamental characteristic of a trust is the separation of legal title (held by the trustees) and equitable title (held by the beneficiaries). *See Myers v. Myers*, 891 S.W.2d 216, 218–19 (Tenn. Ct. App. 1994); *Black's Law Dictionary* 1740 (10th ed. 2014) (defining a "trust" as "[t]he right, enforceable solely in equity, to the beneficial enjoyment of property to which another person holds the legal title"). The Residential Trust reflects this separation of title. First, it appoints the Blasingames as the initial trustees and grants the trustees broad power to manage, encumber, and otherwise dispose of the trust property—i.e., legal title. *See Jourolman v. Massengill*, 5 S.W. 719, 725 (Tenn. 1887); Restatement (Third) of Trusts § 42. Second, it

---

[1]The bankruptcy court concluded that the Bankruptcy Trustee still owns the right to pursue this life estate action. That necessarily entailed a conclusion that, unlike the self-settled action, the life estate action was *not* within the scope of the Sale Order. Neither party challenges that conclusion on appeal, so we decline to revisit it.

subjects the trustees' broad legal title to the interests of several beneficiaries, including the Blasingames, their children, and various Tennessee civic institutions. (Although it may seem odd that the Blasingames are both trustees and beneficiaries, trust law generally permits extensive trustee/beneficiary overlap. Essentially, overlap is fine so long as the trust does not have a single person as both the sole trustee and sole beneficiary. *See Miller v. Miller*, 304 S.W.2d 74, 81 (Tenn. 1957). Hence, Church does not challenge the Residential Trust on this basis). The Residential Trust provides that the trustees must pursue the beneficiaries' best interests, but the trustees have broad discretion in carrying out that duty. And the beneficiaries' rights are limited by a spendthrift provision that (1) restricts their ability to "sell[,] mortgage[,] or encumber" the trust property and (2) provides that the trust property and income cannot be "subject to the claims of creditors of any beneficiaries in any manner." 15-00339 A.P.R. 31-10 ¶ 6. So the Residential Trust, like any other trust, grants broad legal title to the trustees and equitable interests to the beneficiaries.

This separation of title confirms that the Blasingames' interest in the Residence is equitable. The relevant granting language provides that the Residence "shall be used as a personal residence" for a list of beneficiaries starting with the Blasingames, who "shall be permitted to reside in the Residence for [their] life." *Id.* ¶ 5(b). In contrast to the broad powers and ownership the trustees have over the Residence, the Blasingames are merely "permitted to reside" there. *Id.* And again, the spendthrift provisions explicitly restrict the Blasingames' rights to encumber the property in any way. When read in light of the other provisions of the trust, the Blasingames' interest looks nothing like "the full enjoyment and use of the property" during life—i.e., nothing like a legal life estate. 28 Am. Jur. 2d *Estates* § 58 (2018).

Predictably then, Church's argument brushes aside the rest of the trust and focuses narrowly on the provision creating the Blasingames' interest. Church points to three cases where similar granting language created a life estate. But two of Church's cases did not involve a trust at all. *See Briggs v. Estate of Briggs*, 950 S.W.2d 710, 711–12 (Tenn. Ct. App. 1977) (interpreting the terms of a will); *Trimble v. Holley*, 358 S.W.2d 343, 344 (Tenn. Ct. App. 1962) (same). Church's last case involved the interpretation of a prenuptial agreement and noted in passing that a trust "create[d] a life estate in the marital residence." *See In re Estate of Belew*,

No. 03A01-9807-CH-00206, 1998 WL 881863, at *2 (Tenn. Ct. App. Dec. 17, 1998). Thus, none of Church's cases even considered the task before us—drawing the line between legal and equitable title. And again, Church's reading neglects (1) the fundamental division of legal and equitable title at the root of all trusts, and (2) the four corners of the Residential Trust, which effectuate this division of title and restrict the beneficiaries' interests through spendthrift provisions. Viewed in context, the Residential Trust grants the Blasingames an equitable, rather than legal, life estate.

Alternatively, Church argues that even if the Residential Trust purports to grant the Blasingames an equitable life estate, the trust is "dry" (and thus invalid) because it imposes no duties on the trustees. "Where the trust imposes no duty upon the trustee, it is dry, and legal title passes not to the named trustee, but rather to the beneficial owner." *Atkins v. Marks*, 288 S.W.3d 356, 368 (Tenn. Ct. App. 2008) (citing *Jourolman*, 5 S.W. at 722 (internal citation omitted)). But this is a low bar: "even minimal duties will suffice" to render a trust active instead of dry. *Id.* For instance, a trust is dry when it completely fails to define the trustee's responsibilities or only requires the trustee to hold the property on behalf of another. *See, e.g.*, *Hall v. Gossum*, 228 S.W. 1039, 1044 (Tenn. 1921); *Baskin v. Commerce Union Bank of Rutherford Cty.*, 715 S.W.2d 350, 353 (Tenn. Ct. App. 1986). In contrast, the Residential Trust imposes a number of specific duties on the trustees, including duties to "hold, manage[,] and invest the assets" (¶ 1), "distribute and apply the income and principal of the trust property" (¶¶ 5, 5(a), 5(e), 5(g)), "appoint one or more persons or entities to serve as Co–Trustee" (¶ 8(b)), and "divide . . . [or] distribute . . . assets." (¶ 9(d)). 15-00339 A.P.R. 31-10. These are at least "minimal" duties, so the Residential Trust is not dry. *See Atkins*, 288 S.W.3d at 368 (finding that a trust was active rather than dry); *Warrick v. Wright*, 884 S.W.2d 126, 127–29 (Tenn. Ct. App. 1994) (same).

Trusts grant legal title to trustees and equitable title to beneficiaries. The Residential Trust is no different. It grants the Blasingames a single, limited right over the Residence—a right to "reside" there. Viewed in context, that right is equitable.

\*       \*       \*

Plaintiffs are "masters of the[ir] complaint[s]," suing where they wish, and under whatever legal theories they wish. *Williams*, 482 U.S. at 395. But those choices matter. In this instance, Church chose the wrong forum to pursue the Investment Trust. And, though Church is in the right forum to pursue the Blasingames' residence, the Blasingames' limited equitable interest in that residence is not available to creditors. Of course, this does not preclude Church from continuing to pursue these assets outside of bankruptcy court.

We affirm.